IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| ANTHONY KAFKA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12-CV-50123 |
| | ) | |
| | ) | Honorable Philip Reinhard |
| v. | ) | Honorable Magistrate Judge Iain |
| | ) | Johnston |
| | ) | |
| DONALD GRADY and TODD | ) | |
| HENERT, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

LISA MADIGAN
Illinois Attorney General

KATHERINE A. CHRISTY
Assistant Attorney General
Office of the Attorney General
100 West Randolph Street, 13th Floor
Chicago, IL 60601
kchristy@atg.state.il.us

## I.     INTRODUCTION

Plaintiff claims that Defendants, Donald Grady ("Grady" or "Chief Grady") and Todd Henert ("Henert" or "Lt. Henert"), retaliated against him and conspired to retaliate against him in violation of the First Amendment.  The parties have completed discovery and, as shown below, the undisputed record evidence demonstrates that Plaintiff's termination from employment was wholly unrelated to his alleged protected speech.  Specifically, Defendants recommended Plaintiff's termination because, during a self-described "meltdown," he threatened to shoot a co-worker while he was shaking, crying and armed with a gun.

## II.     FACTS[1]

Plaintiff, Anthony Kafka, was a police officer with the Northern Illinois University Department of Public Safety (NIUPD) from 2001 until his termination in 2011.  All NIUPD officers are members of the Metropolitan Alliance of Police, Chapter 291 ("MAP" or "Union").  Defendants are Grady, former Chief of Police, and Henert, former Lieutenant and Director of Police Operations.  (Facts ¶¶ 1-3.)

During the first several years of Plaintiff's employment, he had an at-fault accident in an NIUPD vehicle, received written reprimands, and received a seven day suspension for conduct unbecoming an officer.  During this time period, Plaintiff did not file any grievances, unfair labor practice charges (ULPs), and did not serve as a union steward or board member.  (Facts ¶¶ 7-10.)

In 2008, the Union and NIUPD negotiated the terms of a new contract.  In June 2008, Plaintiff was elected Vice President of the Union and he served as a Union steward.  After the implementation of the new contract, a dispute arose concerning the number of hours assigned to

---

[1] Defendant's Rule 56.1 Statement of Uncontested Material Facts is incorporated herein and provides a comprehensive recitation of the undisputed facts underlying Plaintiff's claims.  The introductory facts provided in this memorandum are not intended to be a complete recitation of the facts but merely an introduction to the issues presented in this case

officers.   During a November 2008 meeting between management and the Union, the Union reported that they were going to file grievances and a ULP.  Although there is some question as to the exact words used, Grady, in some words, equated the Union filing a ULP with going for the "nuclear option" or "nuclear war."   Grady testified that he was not upset that the Union planned to file a ULP, but made this statement because he thought it was strange that they would immediately go for the most "extreme option," rather than pursuing other options first such as arbitration.  Plaintiff does not recall Lt. Henert saying anything during the meeting.  In 2008, the Union filed a ULP concerning hours and overtime, which it lost.   During the same time period, Plaintiff assisted other officers file grievances. (Facts ¶¶ 17-21, 29-30.)

In May 2010, Plaintiff submitted a request for vacation indicating that he would like to be off work on June 5, 2010, for his anniversary.  His request specifically stated, "Provided I am not scheduled for training or required to supplement patrol due to staffing shortage, I am requesting this vacation."  NIUPD conducts annual training at the end of the Spring Semester.  In 2010, it was scheduled for the first week of June.  Officers are advised early in the semester that vacation requests during the training period will likely not be granted.   In late May and early June 2010, another officer, Karen Clifton, was off work due to an injury, which resulting in a staffing shortage.  (Facts ¶¶ 36-38.)

In May 2010, an initial schedule was posted scheduling Plaintiff for twelve hours on June 5, 2010.  In response, Plaintiff stated that if he could not have the entire day off, he would like to leave work after seven hours.  NIUPD changed the schedule so he could leave after eight hours.  On May 27, 2010, Plaintiff reported to work, reviewed the revised schedule and became "greatly upset" that he was still scheduled to work on June 5, 2010.  He became so upset that his hands were shaking, he began to cry, and, while armed, he shouted, "I don't know if I should shoot

Karen (Clifton), or if I should shoot the rest of you all!" Plaintiff continued to shout in "loud rapid speak" and, although he can't remember exactly what he said, he used a lot of profanity. At no point during Plaintiff's outburst did he give any indication that he was kidding or joking. Plaintiff characterized his own behavior as a "melt-down." During his melt-down, he also slammed his fists on a table and slapped a wall. Plaintiff informed his immediate superior at the time that he wanted to go home and gave him a "Report of Absence" form. On the form, Plaintiff wrote that "PSYCOLOGICAL DISTRESS!!" was the reason for absence. (Facts ¶¶ 38-41.)

   The same day, Plaintiff visited an NIU wellness counselor and saw a physician who recommended that he take two weeks off of work. NIU, a University that suffered a tragic mass shooting in 2008, promptly placed Plaintiff on paid leave effective immediately and convened the University Threat Assessment Team (a body created to assess potential risks after the 2008 shooting) to analyze the risk posed by Plaintiff.[2] Likewise, NIUPD promptly conducted an investigation into Plaintiff's outburst to determine if he posed a threat and proper next steps. Lt. Henert, who was the Direct of Police Operations, conducted the investigation, which included witness interviews, review of surveillance video, reviewing Plaintiff's voluntary statement and reviewing witness statements. Henert also considered statements written by all eleven NIUPD Sergeants regarding their concerns about working with and supervising Plaintiff going forward. All eleven sergeants stated they believed Plaintiff should be terminated. After his investigation, Henert made a recommendation to Grady that Plaintiff's employment should be terminated because "no corrective disciplinary action, counseling or training can reasonably assure" that behaviors such as his May 27 outburst would not be repeated, "placing people at risk of injury or

---

[2] The Threat Assessment Team rated Plaintiff as a 3.5 on a matrix of 5, indicating that he posed a moderate to high risk to the NIU Community.

loss of life."   After making his recommendation to Grady, Henert played no further role in the discipline process.  (Facts ¶¶ 43-57.)

Grady considered all elements of Henert's investigation, and also asked Plaintiff to be evaluated by a licensed psychologist.  Dr. Vaughn, a psychologist used by NIUPD in the past, conducted a psychological interview of Plaintiff and sent Grady a seven-page written assessment.  The assessment noted that Plaintiff had "an obsessional focus over which he seemed to have only minimal control" and, among other findings, stated  "future 'meltdowns' are a distinct likelihood."  On August 20, 2010, after considering Dr. Vaughn's report, Lt. Henert's investigative findings, witness statements, and Plaintiff's own version of events. Grady sent Plaintiff a Recommendation for Termination, which was also sent to Human Resources. After Grady made his recommendation for termination, the matter moved to Human Resources for decision.  Chief Grady and Lieutenant Henert did not have the authority to terminate Plaintiff's employment.   In the past, Human Resources did not always follow the recommendation of Grady with respect to terminations.  (Facts ¶¶ 58-68.)

On September 29, 2010, NIU sent Plaintiff a Notice of Intent to Discharge, reading, "The substance of intent to discharge is as follows: May 27, 2010, while armed and on duty, and in a fit of rage, in the presence of a supervisor, you sated 'I don't know if I should shoot Karen or if I should shoot the rest of you all."   In December 2010, Plaintiff received a Recommendation for Discharge from the Vice President of Human Resources and Compliance.  Plaintiff was officially discharged from employment on June 2, 2011.  (Facts ¶¶ 69-70.)

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Cady v. Sheahan*, 467 F.3d 1057, 1060-61 (7th Cir. 2006).  A genuine issue of material

fact is one that might affect the outcome of the lawsuit; factual disputes that are irrelevant should not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## IV.   ARGUMENT

### 1.   PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM FAILS

To establish a claim for retaliation in violation of the First Amendment, a public employee must prove that (1) he engaged in constitutionally protected speech, (2) the defendants, as public officials, engaged in adverse conduct against him, and (3) the defendants were motivated, at least in part, by his protected speech. *Bivens v. Trent*, 591 F.3d 555, 559 (7th Cir. 2010). If Plaintiff meets this *prima facie* case, the burden shifts to Defendants to show "that it would have reached the same decision…even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. V. Doyle*, 429 U.S. 274, 287 (1977). If Defendants carry this burden, the plaintiff must then demonstrate that the defendant's proffered reasons for the decision is pretextual. *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011).

Plaintiff's First Amendment retaliation claim fails because his speech was not protected by the constitution, and he cannot demonstrate that his termination was motivated by his speech.[3]

---

[3] Defendants concede, solely for purposes of this Motion, that Plaintiff's discharge meets the requisite standard for a deprivation under prong two of the *prima face* case. However, Plaintiff alleges that he suffered two other deprivations, neither of which constitute deprivations likely to deter protected speech. First, Plaintiff claims that he was given "tedious shift assignments" in that he was required to work an assignment called "Book Buyback" for a few days, and that he was not given a patrol vehicle while working the SAFE patrol. (Facts ¶ 5.) The record evidence is clear that the vast majority of NIUPD officers do not operate vehicles during their shifts because NIUPD has only a few vehicles. (Facts ¶ 26.) Plaintiff himself admitted that he had "no reasonable expectation" of being assigned a patrol vehicle. (Facts ¶ 29.) In addition, the record is clear Plaintiff worked "Book Buyback" – a standard assignment – for only a few days. Finally, Plaintiff's pay, seniority and title did not change at any point as a result of either of these "tedious assignments." Second, Plaintiff alleges that his request to take his anniversary (June 5, 2010) off was not granted, and that his two-week schedule was changed. The record is clear that the requested vacation date fell during an annual training, NIUPD officers are informed months in advance that vacation requests during this period will not be granted, and that, because Officer Karen Clifton who was injured, there was an additional staffing shortage.. (Facts ¶¶ 36-37.) Finally, the schedule at issue covered only a two-week period, and Plaintiff admitted that shift and schedule changes are routine in policing. (Facts ¶¶ 39-40.) Neither of these alleged adverse actions constitute deprivations

Finally, Plaintiff cannot demonstrate that Defendants' reason for recommending his termination – threatening to shoot a co-worker while armed, shaking, crying and shouting – was pretext.

### A.      Plaintiff's Speech was Not Constitutionally Protected

When a public employee sues under the First Amendment's Speech Clause, he must show that he or she spoke as a citizen on a matter of public concern. *Connick v. Myers*, 461 U.S. 138 (1983). If an employee does not speak as a citizen, but rather as an employee, or does not address a matter of public concern, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to an employee's behavior." *Borough of Duryea, Penn. et al., v. Guarnieri*, 131 S.Ct. 2488, 2493 (U.S. 2011). Evaluating whether an employee expressed himself as a citizen upon matters of public concern is a question of law for the court, not a jury. *Connick v. Myers*, 461 U.S. 138, 147 (1983); *Milwaukee Deputy Sheriff's Ass'n*, 574 F.3d at 377 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). The court must consider "the content, form, and context" of the speech. *Connick*, 461 U.S. at 147-48. Although no one factor is dispositive, the content of the speech is the most important, and the motivation behind the speech is crucial. *Bivens at* 560-61. Speech is not protected when the point of the speech is merely to further an employee's position in a private dispute with his superiors. *Cliff v. Bd. of Sch. Commr's of City of Indianapolis*, 42 F.3d 403, 411 (7th Cir. 1994).

Focusing on the content of Plaintiff's speech and the motive behind it reveals that he spoke on matters of personal interest, not public concern. His alleged speech consisted of:

---

likely to deter speech. Although §1983 does not require an adverse employment action within the meaning of Title VII, trivial and minor incidents that that merely make an employee unhappy do not rise to the level of a constitutional deprivation likely to deter speech. *See Sneed v. City of Harvey*, No. 11-cv-6616, 2013 WL 6697807, at *11 (N.D. Ill. Dec. 19, 2013) (citing *Massey v. Johnson*, 457 F.3d 711, 721 (7th Cir. 2006) and *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

- Acting as Vice President of the Union when it filed a ULP concerning the reduction of hours;
- Filing grievances relating to the reduction of hours;
- Filing grievances on his own behalf, the basis of which was his displeasure with his shift assignment, not being assigned a patrol vehicle, and discipline he received for his second, at-fault traffic crash and for going outside his chain of command;
- Sending a letter to the President of NIU about his dissatisfaction with Chief Grady; and
- Contacting the Cook County State's Attorney to claim that Lt. Henert lied under oath during a ULP hearing.  (Facts ¶ 4.)

When the content of this speech is examined, it is clear that Plaintiff was speaking from a position of personal interest.  None of his grievances raised matters of "public concern."  Instead, his grievances focused on his personal unhappiness with receiving discipline, fewer hours, and not being assigned a squad car – all issues personal to him.   The ULP concerned reduced hours for officers within NIUPD.  At no point did Plaintiff's speech indicate that these reduced hours posed any type of harm or concern to the public.[4]  Moreover, even if the reduced hours were of concern to the public, Plaintiff never articulated this concern, which is fatal to his claim.  *Cliff*, 42 F.3d at 410 (fact that a topic of speech that may be deemed one of public import does not automatically render the subject protected.)

Nor is Plaintiff's speech protected merely because he articulated it through union activity.   Union activity does not automatically transform speech into protected speech.  *See Bivens v. Trent*, 591 F.3d 555, 560-61 (7th Cir. 2010).  While some union activities constitute protected speech, it does not follow that all activities of a union or its members are protected.  *Hanover Twp. Fed. of Teachers Local 1954 (AFL-CIO) v. Hanover Comm. Sch. Corp.,* 457 F.2d 456, 460 (7th Cir.1972).  Instead, the content of union speech is what is important.  *Bivens,* 591 F.3d 560-561.  As discussed above, the content of Plaintiff's union-related speech related solely to private concerns – there is not even a mention of public concern.

---

[4] The reduced hours meant that officers would work fewer hours per duty-cycle, it did not result in staffing shortages on shifts.

Finally, Plaintiff's letter to the NIU President and his alleged phone call to the State's Attorney were nothing more than an attempt to further his private dispute with his superiors, rather than raise issues out of public concern. The record is devoid of any evidence that he raised these issues out of any concern for the public – or what that concern would even be. As such, this speech was not protected. *See Cliff,* 42 F.3d at 411. Regardless, even if he could demonstrate that this is protected speech, as discussed below, Defendants were not even aware of this speech until this lawsuit. Because Plaintiff's speech was not protected and Defendants are entitled to summary judgment.

### B. Plaintiff Cannot Demonstrate the Required Causal Connection

Even if Plaintiff's speech was protected, NIU did not terminate him *because of* this speech. NIU terminated Plaintiff's employment because, while armed and on duty, and in a fit of rage, Plaintiff said "I don't know if I should shoot Karen or if I should shoot the rest of you all." (Facts ¶ 69.) His retaliation claim fails for the simple reasons that he cannot connect his union activity to his termination.[5] Plaintiff cannot establish the required nexus for several reasons.

First, Plaintiff has no factual evidence of a connection besides the mere fact that his union activity preceded his termination. It is well settled that this is insufficient to meet his burden. *Mullin v. Gettinger*, 450 F. 3d 280, 285 (7th Cir. 2006) (mere fact that a speech may precedes an adverse employment decision alone does not establish causation). Nor did Plaintiff's termination suspiciously come on the heels of his speech. Instead, the facts

---

[5] Plaintiff claims that he suffered three adverse actions: (1) tedious shift assignments; (2) the denial of a vacation request and change to his two week schedule; and (3) his termination. As discussed in FN2 *supra*, "tedious shift assignments," the denial of a vacation request, and a change to a two-week schedule do not constitute adverse employment actions. Even if they did, Defendants have identified legitimate, non-retaliatory reasons for their actions. Therefore, for purposes of this section, Defendants will focus solely on Plaintiff's termination.

demonstrate that approximately twenty-one months after the Union informed Defendants that it planned to file a ULP, ten months after he filed other grievances, and nearly eight months after he testified at a ULP hearing, Defendants recommended Plaintiff's termination because of his meltdown.[6] (Facts ¶¶ 22, 29, 30, 63.)   The mere fact that his alleged speech preceded his "meltdown" and subsequent termination is insufficient to demonstrate causation.   *See e.g. Filipovic v. K&R Express*, 176 F.3d 390, 399 (7<sup>t</sup>h Cir. 1999 (four month lapse too long); *Admusumill v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (eight month interval too long).

Second,   Plaintiff cannot demonstrate the required nexus because Defendants did not terminate his employment.  The crux of Plaintiff's claim is his belief that Defendants were angry with him for filing grievances and a ULP, and therefore retaliated against him by terminating his employment.   Missing from this equation is Plaintiff's intervening "outburst" as well as the fact that neither Defendant had the authority or ability to terminate his employment.   The record is clear that Henert and Grady could not and did not terminate Plaintiff's employment.   After making his recommendation to Grady, Henert played no role in the decision making process. Moreover, Grady was under no obligation to follow Henert's recommendation.  In fact, Grady often reduced disciplinary recommendations made by Henert.   After receiving Henert's recommendation, Grady conducted his own inquiries, including asking a psychologist to assess Plaintiff.   Based in large part upon that assessment, Grady recommended Plaintiff's termination to NIU's Human Resources.  In turn, NIU was not required to follow Grady's recommendation and did not follow at least one of Grady's recommendations for termination.   After NIU took

---

[6] Plaintiff's Complaint also references additional grievances filed on behalf of other employees, his letter to the University President, and his report to the State's Attorney's Office about Henert's ULP testimony. However, any attempt at connecting this to his termination is even less compelling.  First, it is undisputed that Grady and Henert did not know that Plaintiff sent a letter to the University President about Grady or that Plaintiff contacted the States Attorney.   Second,  although Plaintiff claims that he filed grievances on behalf other employees, he filed them in the grievant's name and there is no evidence that Defendants knew that he did the actual filing since the grievances bore the names of the grievant.  (Facts ¶ 78-79.)

over the process, it conducted its own hearing, and relied on the evaluation of the Threat Assessment Team (wholly separate from Henert and Grady), before making the decision to terminate Plaintiff. (Facts ¶¶ 64, 66-68.)

Third, Plaintiff cannot establish causation because, the record is clear that Defendants would have recommended Plaintiff's termination even in the absence of his speech. *See Mt. Healthy*, 429 U.S. at 287. The reason Defendants recommended Plaintiff's termination was because, during his outburst, he exhibited significant indicators of being a danger to himself or others – an issue they had no assurance would not be a threat going forward. In fact, a psychologist told Grady there as a "distinct likelihood" it would be a threat to peoples' safety going forward. Defendants felt that putting someone who had exhibited this instability back to work, armed with a department issued firearm, was simply irresponsible. (Facts ¶¶ 40-70.) This is a legitimate reason to recommend someone's termination – and one that is *wholly* unrelated in any way to Plaintiff's union activity. *Bodenstab v. County of Cook*, 569 F.3d 651 (7ᵗʰ Cir. 2009 ) (decision to terminate employee based on these threats was legitimate and not pretext); *Smith v. American Airlines, Inc.*, 31 Fed.Appx. 312, 314 (7ᵗʰ Cir. 2002) (terminating for threatening another coworker is a legitimate, non-discriminatory reason). Because there is no evidence of a nexus between Plaintiff's speech and the reason Defendants recommended his termination, his claim should be dismissed.

### C. Regardless, Plaintiff Cannot Establish Pretext

The burden is on Plaintiff to overcome this legitimate reason offered for his termination and establish that it is nothing more than pretext for unlawful discrimination. *Nawroot v. CPC Int'l*, 277 F.3d 896, 905-906 (7th Cir. 2002).

Pretext is a lie to cover up discrimination. *Birch v. Illinois Bone & Joint Inst., Ltd*., No.

04-cv-7285, 2006 WL 2795040, at *7 (N.D. Ill. Sept. 28, 2006) (*quoting Wolf v. Buss (Am.), Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)). To establish pretext, Plaintiff must identify inconsistencies making it plausible for a jury to find Defendant's reasoning "unworthy of credence." *Fane*, 480 F.3d at 541. To demonstrate pretext, a plaintiff must show more than defendant's decision was mistaken, ill considered or foolish, and as long as the employer honestly believes those reasons, pretext has not been shown." *Bodenstab,* 569 F.3d at 658 (citing *Hague v. Thompson Distrib. Co.,*436 F.3d 816, 823 (7th Cir.2006). Thus, the Court's only concern is with the honesty of Defendant's beliefs, not whether Plaintiff's threat was serious. *Id.*

To establish pretext, Plaintiff must demonstrate that Henert and Grady's concerns about his behavior on May 27 were more than unfounded – that they were a *lie*. This is something he cannot do for the several reasons.

First, it is undisputed that on May 27, 2010, while armed, crying and under "PSYCHOLOGICAL DISTRESS!" Plaintiff shouted, "I don't know whether to shoot Karen or the rest of you." This behavior was so extreme that Plaintiff himself said it warranted a thirty day suspension. (Facts ¶¶ 40-46, 64.) Second, it is undisputed that Henert, Grady and NIU conducted a thorough investigation into the incident before making their recommendations. Only after reviewing Plaintiff's statement (in which he put Defendants on notice that he had access to weapons, including an assault rifle), witness statements (including statements provided by some of Plaintiff's friends), interviewing witnesses and reviewing the sergeants' statements, did Henert make his recommendation. Grady considered all the evidence from Henert's investigation, but also weighed heavily the assessment from Dr. Vaughn, a licensed psychologist, who said there was a "distinct" likelihood that Plaintiff would have another "meltdown," and exhibit behavior that could escalate and lead to the loss of life in the future. (Facts ¶¶ 40-65.)

<u>Third</u>, Plaintiff's "meltdown" occurred on a campus that had already suffered a tragic mass shooting. As first responders, this tragedy had a particularly profound impact on the NIUPD. The record is clear that the tragedy of February 14, 2008 was on the minds of Defendants when making their recommendations. For these reasons, there is simply no basis to call into question the veracity of Defendants' concerns. (Facts ¶¶ 11-15, 53-55, 63.)

Finally, even if Plaintiff could question the validity of Defendants' concerns (which he cannot), there is no evidence that the real reason for Defendants' recommendations was Plaintiff's speech. In fact, *before* Plaintiff engaged in any speech, Defendants issued him discipline, including the longest suspension he ever served. Moreover, months *after* his speech, Grady recommended that a suspension Plaintiff was to receive be reduced – refuting any possible inference of animus. Finally, *none* of the other Union Board members involved in the ULP or filing grievances were terminated or received substantial discipline. (Facts ¶¶ 7-10, 24, 73-74.)

## III. PLAINTIFF'S CONSPIRACY CLAIM IS BARRED BY THE INTRA-GOVERNMENTAL CONSPIRACY DOCTRINE

The Complaint also alleges that Defendants conspired to retaliate against Plaintiff in violation of the First Amendment. Conspiracy itself is not an independent basis of § 1983 liability. There must be an underlying constitutional injury or the attendant conspiracy claim necessarily fails. *Hill v City of Chicago*, No. 06 cv 6772, 2009 WL 174994, at *9 (N.D. Ill. Jan. 26, 2009)(citing *Reynolds*, 488 F.3d at 764.) Because Plaintiff's underlying retaliation claim fails as a matter of law, Defendants are entitled to summary judgment.

Nevertheless, Plaintiff's conspiracy claim is barred by the doctrine of Intra-governmental Immunity. The Seventh Circuit has adopted a rule which provides that "a conspiracy cannot exist solely between members of the same entity." *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir. 1999). The doctrine also extends to claims against individual

members of a single government entity and, although Payton dealt with a § 1985 claim, courts in this jurisdiction have extended the doctrine to § 1983 claims. *Wright v. Ill. Dep't of Children & Family Servs.,* 40 F. 3d 1492, 1508 (7th Cir. 1994); *Piphus v. City of Chicago Police Dept.*, No. 12-cv-7259, 2013 WL 3975209, at* 8 (N.D. Ill. Aug, 1, 2013) (citing *Tabor v. City of Chi.*, 10 F.Supp.2d 988, 994 (N.D. Ill. 1998) (collecting cases). The doctrine applies when the wrongful conduct was performed within the scope of the conspirators official duties and the conspirators ability to injure the plaintiff stemmed solely from their position. *Wright,* 40 F.3d at 1508.

Here, Henert and Grady were members of the same police department and none of the decisions about which Plaintiff complains – an assignment he did not like, the denial of a vacation request, and the recommendation for his termination – were made by Grady or Henert outside their official duties. The record evidence is clear that Henert and Grady approved all shift assignments and schedules as part of their duties. The record also demonstrates that Henert previously conducted investigations into misconduct, and routinely made recommendations for discipline to Grady. Finally, Grady made all recommendations for termination to Human Resources. Because these actions were derived from Defendants' official duties, and they were solely acting within the scope of their employment, Plaintiff's conspiracy claim fails as a matter of law. *See Piphus*, 2013 WL 3975209 at *8.

However, even if Plaintiff's claim did not fail under the intra-governmental doctrine (which it does), his conspiracy claim falls flat because the record is entirely devoid of facts suggesting a coordinated effort or agreement to retaliate between Grady and Henert. *Id.* (citing *Redwood v. Dobson*, 476 F.3d 462, 466 (7th Cir. 2007)) ("The minimum ingredient of a conspiracy … is an agreement to commit some future unlawful act in pursuit of a joint objective."). When pointedly asked what evidence Plaintiff has of a conspiracy between Grady

and Henert, he simply said "their actions." This is not sufficient to establish a conspiracy.

## IV. DFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Finally, even if this Court finds that Plaintiff's claims rise to the level of a constitutional violation, Defendants are entitled to qualified immunity. Qualified immunity is a defense available to state and federal officials to afford protection when they are required to exercise discretion. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an issue for the court, not for the jury. *Maltby v. Winston*, 36 F.3d 548 (7th Cir. 1994.)

Qualified immunity shields government officials from individual liability under §1983 for discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This standard permits ample room for mistaken judgment by protecting all but the plainly incompetent or those who knowingly violate the law. *Gregorich v. Lund*, 54 F.3d 410, 414-15 (7th Cir. 1995) (citations omitted). The plaintiff has the burden of establishing the existence of the allegedly clearly established constitutional right by reference to closely analogous cases. *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir. 1998), *cert. denied* 488 U.S. 968 (1988). It is not sufficient to simply invoke the axiom that it was clearly established that retaliation for an employee's protected speech violates the constitution. *Wernsing v. Thompson*, 423 F.3d 732, 749-50 (7th Cir. 2005).

As discussed above, Plaintiff is unable to establish the violation of a constitutional right. Plaintiff's speech was not protected and the recommendation for termination was in no way tied to Plaintiff's union activity. At its core, this is precisely the type of case that qualified immunity is meant to protect public servants from. Defendants cannot be at their peril simply because they legitimately believed that their interests in protecting the NIU community outweighed any potential First Amendment rights of Plaintiff. Defendants recommended the termination of an

individual whom they believed posed a threat to NIUPD and the NIU community. A psychologist advised Chief Grady that there was a "distinct likelihood" that Plaintiff's May 27 "meltdown" would occur again. Both Defendants felt that allowing Plaintiff to return to duty and carry a department issued gun was irresponsible and posed a danger to the very community they were in charge of policing and protecting. Defendants needed to be able to exercise discretion and make decisions about how to best protect NIU and the NIUPD without fear of being sued. As such, Defendants' actions are protected from this lawsuit by qualified immunity.

## V.    CONCLUSION

Because Plaintiff cannot establish a *prima facie* case of retaliation or that Defendants' reason for recommending his discharge was pretext, summary judgment on all claims is proper. In any event, Defendants are entitled to qualified immunity.


Respectfully submitted,
LISA MADIGAN                                    **Donald Grady & Todd Henert**
Illinois Attorney General

                                    By:      /s/Katherine A. Christy
                                             KATHERINE A. CHRISTY
                                             Office of the Attorney General
                                             100 West Randolph Street, 13th Floor
                                             Chicago, IL 60601
                                             (312) 814-3739

15